IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY *wbc* D.C.

05 JUN -9 AM 10: 35

ROBERT R. DI TROLIO
CLERK, U.S. DIST. CT.
W.D. OF TN, MEMPHIS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

                               No. 03-20400 B

LOGAN YOUNG,

      Defendant.

---

### ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND FOR ARREST OF JUDGMENT, AND DENYING MOTION FOR NEW TRIAL

---

This prosecution involves the payment by the Defendant, Logan Young, a "booster" for the University of Alabama football program, of money to Lynn Lang,[1] a teacher and football coach at Trezevant High School in Memphis, Tennessee, in exchange for influencing a talented student-athlete, Albert Means, to sign with Alabama. In a three-count indictment filed October 30, 2003, Young was charged with: (1) conspiracy to travel and use interstate commerce in aid of racketeering and to structure a financial transaction to evade federal reporting requirements; (2) bribery of a public servant; and (3) structuring, for purposes of evading reporting requirements, a $150,000 financial transaction while violating another federal law, specifically, "travel and use of facilities in interstate commerce in aid of racketeering, and as part of a pattern of illegal activity involving more than one hundred thousand dollars ($100,000.00) in a twelve (12) month period," in violation of 18 U.S.C. §§ 371 and 1952, and 31 U.S.C. § 5324(a)(3). The indictment also alleged forfeiture in the amount of $150,000.00 with respect to Count 3, pursuant to 31 U.S.C. § 5317(c)(1)(A). Following

---

[1]Lang has plead guilty to conspiracy to defraud the United States in a separate case in this district and has been sentenced.

This document entered on the docket sheet in compliance
with Rule 55 and/or 32(b) FRCrP on *6-10-05*

(188)

trial, the jury entered a verdict on February 2, 2005, finding Young guilty as to Counts 1 through 3 of the indictment. After being instructed by the Court to resume deliberation as to the forfeiture allegation, the jury, on February 3, 2005, issued a special verdict on forfeiture in the amount of $96,100.00.

The Defendant has filed post-trial motions for judgment of acquittal under Rule 29(c) of the Federal Rules of Criminal Procedure; for arrest of judgment as to forfeiture pursuant to Fed. R. Crim. P. 34(a); or, in the alternative, for dismissal of the forfeiture count for failure to state an offense. Young also seeks a new trial in accordance with Rule 33, Fed. R. Crim. P.

The Defendant argues that the forfeiture count is unenforceable because the statute upon which it is based was not enacted until after the alleged criminal conduct occurred. Count 3 charged that "[f]rom on or about September 2, 1999 until October 6, 2000," Young structured financial transactions for the purposes of evading federal reporting requirements of § 5317(c)(1)(A). It is the contention of the Defendant that, as the forfeiture statute was not enacted until October 26, 2001, the *ex post facto* clause, U.S. Const. Art. I §9, bars retroactive application of the law in this case.

The *ex post facto* clause bars application of a law "that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." Johnson v. United States, 529 U.S. 694, 699, 120 S.Ct. 1795, 1800, 146 L.Ed.2d 727 (2000). "To prevail on this sort of *ex post facto* claim, [Young] must show both that the law he challenges operates retroactively (that it applies to conduct completed before its enactment) and that it raises the penalty from whatever the law provided when he acted." Id., 120 S.Ct. at 1800.

"Retrospective application alone, however, is not enough to make out an *ex post facto* violation." United States v. Ristovski, 312 F.3d 206, 210 (6th Cir. 2002), cert. denied, 538 U.S. 979,

2

123 S.Ct. 1804, 155 L.Ed.2d 669 (2003).  Moreover, "the inhibition upon the passage of *ex post facto*

laws does not give a criminal a right to be tried, in all respects, by the law in force when the crime

charged was committed. . . . [N]either does it require that the sentence be carried out under the

identical legal regime that previously prevailed."  <u>California Dep't of Corr. v. Morales</u>, 514 U.S. 499,

510 n.6, 115 S.Ct. 1597, 1603 n.6, 131 L.Ed.2d 588 (1995).

> The constitutional provision was intended to secure substantial personal rights
> against arbitrary and oppressive legislation, and not to limit the legislative control of
> remedies and modes of procedure which do not affect matters of substance.  Thus,
> no *ex post facto* violation occurs if a change does not alter substantial personal rights,
> but merely changes modes of procedure which do not affect matters of substance.
> Even though it may work to the disadvantage of a defendant, a procedural change is
> not *ex post facto*.

<u>Ristovski</u>, 312 F.3d at 210 (internal citations and quotation marks omitted).

Section 5317, the forfeiture statute charged in the indictment, as amended, provides in

pertinent part that "[t]he court in imposing sentence for any violation of section 5313, 5316, or 5324

of this title, or any conspiracy to commit such violation, shall order the defendant to forfeit all

property, real or personal, involved in the offense and any property traceable thereto."  31 U.S.C. §

5317(c)(1)(A) (2001).  The predecessor, in force at the time the alleged crime was committed,

provided as follows:

> If a report required under section 5316 with respect to any monetary instrument is not
> filed (or if filed, contains a material omission or misstatement of fact), the instrument
> and any interest in property, including a deposit in a financial institution, traceable
> to such instrument may be seized and forfeited to the United States Government.
> Any property, real or personal, involved in a transaction or attempted transaction in
> violation of section 5324(b), or any property traceable to such property, may be
> seized and forfeited to the United States Government. . . .

31 U.S.C. § 5317(c) (1992).  The Government maintains that, although a violation of subsection (a)

of § 5324 did not trigger forfeiture under the prior version of the statute, forfeiture for § 5324

3

violations in general was provided for at that time under 18 U.S.C. § 982(a)(1), enacted in 1994, which states that "[t]he court, in imposing sentence on a person convicted of an offense in violation of section 5313(a), 5316, or 5324 of title 31, . . . shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." See United States v. One 1985 Mercedes-Benz, 300 SD, 14 F.3d 465, 467 (9th Cir. 1994) (pre-amendment case noting that criminal forfeiture for violation of § 5324(a) would proceed under 18 U.S.C. § 982). Thus, prior to the amendment of § 5317 in 2001, the federal statutes provided for forfeiture of property to the same extent set forth in the statute as amended. As the Defendant cannot establish and, in fact, has not argued, that the forfeiture statute referred to in the indictment and under which he was convicted "raise[d] the penalty from whatever the law provided when he acted," he cannot prevail on his *ex post facto* claim. See Johnson, 529 U.S. at 699, 120 S.Ct. at 1800. Accordingly, his motion for judgment of acquittal, for arrest of judgment, and for dismissal of the forfeiture count on this ground is DENIED.

Young next avers, pursuant to Rules 29 and 33, that the evidence presented at trial was insufficient to support a conviction and that certain jury instructions were in error. In deciding a Rule 29 motion based on insufficient evidence, the relevant question is "whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Caseer, 399 F.3d 828, 840 (6th Cir. 2005) (quoting United States v. Bashaw, 982 F.2d 168, 171 (6th Cir. 1992)). "The government must be given the benefit of all inferences which can reasonably be drawn from the evidence, even if the evidence is circumstantial. It is not necessary that the evidence exclude every reasonable hypothesis except that of guilt." United States v. Carter, 355 F.3d 920, 925 (6th Cir.

4

2004) (quoting <u>United States v. Head</u>, 927 F.2d 1361, 1365 (6th Cir. 1991)).  The Court cannot "weigh the evidence, consider the credibility of witnesses or substitute [its] judgment for that of the jury." <u>United States v. Meyer</u>, 359 F.3d 820, 826 (6th Cir.), <u>cert. denied</u>, ___ U.S. ___, 125 S.Ct. 112, 160 L.Ed.2d 182 (U.S. Oct. 4, 2004) (No. 04-5573).

Unlike Rule 29, Fed. R. Crim. P. 33 permits the trial judge to consider the credibility of witnesses and to weigh the evidence to insure there is no miscarriage of justice.  <u>United States v. Solorio</u>, 337 F.3d 580, 589 n.6 (6th Cir.), <u>cert. denied</u>, 540 U.S. 1063, 124 S.Ct. 850, 157 L.Ed.2d 723 (2003).  A defendant's burden on a Rule 33 motion for a new trial is a heavy one.  <u>United States v. Ware</u>, 282 F.3d 902, 906 (6th Cir. 2002).  While the granting of a motion for a new trial is discretionary, such discretion should be used only in "extraordinary circumstances where the evidence preponderates heavily against the verdict." <u>United States v. Damrah</u>, 334 F.Supp.2d 967, 983 (N.D. Ohio 2004).  In issuing its ruling, the Court must keep in mind the provisions of Fed. R. Crim. P. 52, which instructs that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."  Fed. R. Crim. P. 52(a).

As an initial matter, the Court will address the Defendant's contention that the testimony of Dr. Johnnie Watson should not have been considered by the Court in deciding his initial Rule 29 motion made at the end of the Government's proof.  In support of his position, the Defendant points to subsection (b) of the Rule, which provides in pertinent part that

> [t]he court may reserve decision on the [Rule 29] motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty or is discharged without having returned a verdict.  *If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.*

5

Fed. R. Crim. P. 29(b) (emphasis added).  After the Government rested its case-in-chief on January 27, 2005, Young's counsel argued pursuant to Rule 29 that acquittal was warranted based on the prosecution's failure to prove that the Defendant had violated the applicable bribery statute. According to the Defendant, the Court reserved its ruling on his motion pending the reopening of the Government's proof in order to hear the testimony of Watson.  He contends, therefore, that the Court's consideration of Watson's testimony, taken after submission of his Rule 29 motion, violated the Rule.

However, as the Government points out, it moved to reopen the proof prior to the Court's taking any action on the Rule 29 motion and was prepared to present Watson's testimony.  At that time, the Defendant requested permission to put on three of his witnesses due to scheduling issues. The Court agreed and these witnesses were heard prior to Watson.  The Defendant then argued, as he has here, that the Court not consider Watson's testimony based on the reopening of the Government's proof.  The Court did not, as the Defendant suggests, "reserve" ruling in the context of Rule 29 but, rather, simply withheld its ruling until the Government's additional proof -- Watson's testimony -- could be heard.  Accordingly, Young's request that the Court disregard Watson's testimony is DENIED.

The Court now turns to the merits of the Defendant's contentions.  He first maintains that there was insufficient evidence upon which the jury could find guilt for making payments to Lang in exchange for his influence with respect to Means' college decision.  The indictment alleged that Young violated the Tennessee bribery statute, which states in pertinent part that

     (a)      [a] person commits an offense who:

           (1)      Offers, confers, or agrees to confer any pecuniary benefit upon a

public servant with the intent to influence the public servant's vote, opinion, judgment, exercise of discretion or other action in the public servant's official capacity; or

(2)    While a public servant, solicits, accepts or agrees to accept any pecuniary benefit upon an agreement or understanding that the public servant's vote, opinion, judgment, exercise of discretion or other action as a public servant will thereby be influenced.

(b)    It is no defense to prosecution under this section that the person sought to be influenced was not qualified to act in the desired way because the person had not yet assumed office, lacked jurisdiction, or for any other reason.

Tenn. Code Ann. § 39-16-102 (2003 Repl.). The Defendant submits that no evidence was presented at trial that college placement recommendations have any connection whatever with the official duties of a high school teacher and/or coach. Thus, he argues, a rational juror could not have concluded that Lang was acting in his "official capacity" as a high school teacher and coach when he accepted payments to influence Means to attend Alabama.

According to the evidence adduced at trial, Lang was a teacher and coach at Trezevant High School, a public school which received funding from local, state and federal tax revenues. Means was a student of Lang and had been coached by him for three years in high school. In his first conversation with Lang, Young asked what kind of influence the coach actually had over Means and specifically what it would take to get Lang to convince the student to attend the University of Alabama. During all of the contacts Young had with Lang, Means was either a student of and/or an athlete coached by Lang. The jury also heard the testimony of Watson, who at the time of the incidents involved was the superintendent of the Memphis city schools. He recalled that he sought the termination of Lang's employment on the grounds of unprofessional conduct with respect to his role in the Means recruiting incident. In Tennessee, "'[u]nprofessional conduct' has been defined as

7

'conduct that violates the rules or the ethical code of a profession or that is unbecoming a member of a profession in good standing, or which indicates a teacher's unfitness to teach." Baltrip v. Norris, 23 S.W.3d 336, 340 (Tenn. Ct. App. 2000), app. denied (July 24, 2000) (quoting Morris v. Clarksville-Montgomery County Consol. Bd. of Educ., 867 S.W.2d 324, 329 (Tenn. Ct. App. 1993)). The Code of Ethics for the Tennessee Education Association directs teachers to "avoid exploiting [their] professional relationship with any student[;]" to "accept no gratuities or gifts of significance that might influence [their] judgment in the exercise of [their] official duties" and to "engage in no outside employment that will impair the effectiveness of [their] professional service and [to] permit no commercial exploitation of [their] professional position."

While the Tennessee courts have not addressed the definition of "official capacity" as the term is used in the bribery statute, the Tennessee Supreme Court's decision in Wells v. State, 129 S.W.2d 203 (Tenn. 1939) is instructive. In Wells, the court was presented with an argument similar to that made in this case in connection with a different statute. The defendant therein was charged with offering a bribe to a police officer who had confiscated his vehicle after a relative who had been driving the car was arrested for speeding and carrying whiskey. Wells, 129 S.W.2d at 203. The bribe was made in exchange for releasing the automobile back to the defendant. Id. at 203-04. The defendant argued that it was beyond the officer's authority to return the vehicle and that, therefore, "the payment of the money by defendant was not a payment with intent to influence the acts of Gustavus as an officer or to induce him to refrain from performing any official duty." Id. at 204. The court disagreed, concluding that

> [t]he gravity of official misconduct is emphasized, in our opinion, if the act corruptly undertaken is beyond the authority of the officer. If an act is done under color of office, it is done officially. Such an act is surely official misconduct, and one who

8

by bribe influences an officer to such misconduct falls under the denunciation [of the statute].

Id.

Upon review of the statutory language, the caselaw, and the evidence presented at trial, the Court cannot determine, after reviewing the evidence in the light most favorable to the Government, that any rational trier of fact could not have found the essential elements of a violation of Tennessee Code Annotated § 39-16-102 beyond a reasonable doubt. See Caseer, 399 F.3d at 840. Therefore, the Defendant's motion for judgment of acquittal must be DENIED.

In his motion for a new trial under Rule 33, the Defendant also avers that certain jury instructions concerning the Tennessee bribery statute were in error. Jury instructions must "adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision." Williams ex rel. Hart v. Paint Valley Local Sch. Dist., 400 F.3d 360, 365 (6th Cir. 2005). "As long as the jury is correctly instructed on the substantive issues in the case, the language and form of jury instructions are committed to the sound discretion of the district court." Larson v. Farmers Co-op Elevator of Buffalo Ctr., Iowa, 211 F.3d 1089, 1096 (8th Cir. 2000).

According to the Defendant, the jury instruction relative to the Tennessee offense of bribery of a public servant (Tenn. Code Ann. § 36-16-102(a)(1)) was an incorrect statement of the law. However, the instruction tracked the language of the statute as well as the language of the Tennessee pattern jury instructions. Therefore, it cannot be said that the instruction failed to "provide a basis in law for aiding the jury in reaching its decision." Williams ex rel. Hart, 400 F.3d at 365; see also Larson, 211 F.3d at 1096 (jury instruction adequate which tracks statutory language).

9

Young also submits that the ambiguity of the term "official capacity" used in the statute requires a more narrow construction of the term than that used in the jury instruction, which defined "[a]n act in one's official capacity" as "an act done under color of office. That is, an act connected with one's official or public duty." The Defendant also took issue with the definition of "official capacity" in his motion to dismiss the indictment in this case, which was denied by the Court. The jury instruction is in line with <u>Wells</u>, discussed previously herein and in the Court's earlier opinion. Young's citation to the United States Supreme Court's 1914 definition of "official capacity" in the context of the federal bribery statute, as set forth in <u>United States v. Birdsall</u>, 233 U.S. 223, 34 S.Ct. 512, 58 L.Ed. 930 (1914) and which he contends supports a narrow interpretation of the term, is unpersuasive in the context of this case. In <u>Birdsall</u>, the Court found that

> [t]o constitute . . . official action, it was not necessary that it should be prescribed by statute; it was sufficient that it was governed by a lawful requirement of the [agency] under whose authority the officer was acting. Nor was it necessary that the requirement should be prescribed by a written rule or regulation. It might also be found in an established usage which constituted the common law of the [agency] and fixed the duties of those engaged in its activities. In numerous instances, duties not completely defined by written rules are clearly established by settled practice, and the action taken in the course of their performance must be regarded as within the provisions of the [federal] statutes against bribery.

<u>Birdsall</u>, 233 U.S. at 230-31, 34 S.Ct. at 514-15. First, the definition with respect to the federal statute is not controlling, as the Travel Act refers exclusively to *state* law. <u>See</u> 18 U.S.C. § 1952(a)(3). Second, it is worth noting that the Sixth Circuit, in <u>United States v. Gjieli</u>, 717 F.2d 968 (6th Cir. 1983), found, citing <u>Birdsall</u> and the Code of Ethics for Government Service, that official acts include duties not to engage in certain conduct. <u>Gjieli</u>, 717 F.2d at 977. Those regulations authorize disciplinary sanctions against employees who violate them, just as does Tennessee law in this case. <u>See</u> <u>id.</u>

10

As the Court concluded in its order denying the Defendant's motion to dismiss the indictment, based on Tennessee law as set forth in <u>Wells</u>, the "Tennessee courts do not subscribe to the narrow interpretation of the term 'official capacity' espoused by the defendant." (Order Denying Def.'s Mot. to Dismiss Indictment at 8.) As the Defendant has failed to convince the Court that its earlier determination was in error, it is the opinion of this Court that the definition of "official capacity" contained in the jury instructions "adequately inform[s] the jury of the relevant considerations and provide[s] a basis in law for aiding the jury in reaching its decision." <u>See</u> <u>Williams ex rel. Hart</u>, 400 F.3d at 365.

The Defendant's argument that due process requires the narrowest possible definition of "official capacity" in order to provide "fair warning" is also unpersuasive. This argument also was raised in the Defendant's motion to dismiss the indictment. The principle of fair warning is "that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." <u>United States v. Lanier</u>, 520 U.S. 259, 265, 117 S.Ct. 1219, 1224-25, 137 L.Ed.2d 432 (1997) (quoting <u>Bouie v. City of Columbia</u>, 378 U.S. 347, 351, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964)). In <u>Lanier</u>, the Supreme Court identified three related manifestations of the fair warning requirement:

> First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. Second, as a sort of junior version of the vagueness doctrine . . . the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered. Third, although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute, due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.

11

Id. at 266, 117 S.Ct. at 1225 (internal citations and quotation marks omitted). In each, "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Id. at 267, 117 S.Ct. at 1225. As the Lanier Court observed,

> general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful. As [Sixth Circuit] Judge Daughtrey noted in her dissenting opinion in this case: "The easiest cases don't even arise. There has never been . . . a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages or criminal liability."

Lanier, 520 U.S. at 271, 117 S.Ct. at 1227-28 (internal citations and quotation marks omitted). As the Court found in its previous opinion, based on Wells, the term "official capacity" as used in the Tennessee statute appears to encompass acts beyond what the public servant is required by his position to perform, and, thus, the Court cannot conclude that the Tennessee bribery law failed to give Young fair warning that his actions may have been unlawful. Therefore, the motion is DENIED.

Further, the Defendant charges that the jury instructions "unduly emphasized" a provision of Tennessee law inapplicable to this case. Specifically, Young points to three separate instructions referencing Tennessee Code Annotated § 39-16-102(b), which provides that "[i]t is no defense to a prosecution under this section that the person sought to be influenced was not qualified to act in the desired way because the person had not yet assumed office, lacked jurisdiction, or for any other reason." The Defendant does not allege that the instructions contained an incorrect statement of the law, but that they erroneously referred to situations in which the person sought to be bribed lacked

12

the authority or ability to effectuate the bribe.  He insists that he does not contest that Lang had the authority or ability to do what was asked of him.  Instead, his only argument has been that Lang had no *duty* to do so.  As the jury instruction contained a correct statement of the law and the Defendant had no dispute with the wording as presented, the motion is DENIED.

Secondly, Young requests that the Court arrest judgment in connection with the forfeiture allegation on the grounds that it fails to state an offense, in accordance with Rule 34(a), Fed. R. Crim. P.  The proof at trial established that Young agreed to pay Lang $150,000.00 to influence Means to attend and play football for Alabama.  Payments to Lang were made in installments of less than $10,000 to avoid bank reporting requirements for cash transactions.  The Government alleged criminal forfeiture in the indictment as to moneys involved in or traceable to the structuring offense or as substitute assets pursuant to 31 U.S.C. § 5217(c)(1)(B) and 21 U.S.C. § 853(p).

As the Court has previously noted herein, the forfeiture statute provides that, in imposing a sentence for a violation of the relevant statute, it must "order the defendant to forfeit all property, real or personal, *involved in* the offense and any property *traceable thereto*." 31 U.S.C. § 5317(c)(1)(A) (2001) (emphasis added).  "Property may be forfeited to the United States through either criminal or civil proceedings.  Criminal forfeitures are *in personam* proceedings, are instituted only in conjunction with criminal charges, and are considered penalties for violations of a criminal statute." United States v. Clinkscale, 86 F.Supp.2d 780, 785 (N.D. Ohio 2000); see also United States v. $69,292.00 in United States Currency, 62 F.3d 1161, 1164 (9th Cir. 1995) (criminal forfeiture under § 5317 is considered "punishment").  In returning the special verdict imposing forfeiture, the jury found that funds of the Defendant in the amount of $96,100.00 were "involved in" the structuring offense set forth in Count 3 of the indictment and upon which he was convicted.  The Defendant

13

does not take issue with the instructions given to the jury on the forfeiture allegation. He instead submits that, because the structured payments went to Lang, who spent the money, funds currently in Young's bank account are not tainted and, therefore, should not be forfeitable.

In analyzing the "involved in" and "traceable to" language in 18 U.S.C. § 982(a), which contains the same language at issue here, the Tenth Circuit, in United States v. Bornfield, 145 F.3d 1123 (10th Cir. 1998), instructed as follows:

> This provision mandates that property with the requisite nexus to the offense of conviction be forfeited. The key to whether property is forfeitable is whether it is "involved in" or "traceable to" the offense.
>
> Property "involved in" an offense includes the money or other property [used in committing the crime] . . . and any property used to facilitate [the offense]. . . . In contrast, property "traceable to" means property where the acquisition is attributable to the . . . scheme . . .

Bornfield, 145 F.3d at 1135 (internal citations omitted). The amount found to be forfeitable by the jury here presumably constitutes at least a portion of the funds paid to Lang, which the jury clearly could have reasonably concluded was "involved in" the structuring offense. Imagine Young being caught with a bag of cash drawn from his bank account on his way into Lang's office. The Defendant appears to acknowledge that *some* money was "involved in" the transactions but that the money in his account now was not.

"Once an asset is determined to be 'forfeitable' . . . as either involved in or traceable to the offense of conviction, the seizure and disposition, including any administrative or judicial proceeding, is governed by the Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 853." Bornfield, 145 F.3d at 1136; see also 31 U.S.C. § 5317(c)(1)(B) (the procedure for forfeiture is governed by § 853.) Even though the funds now in Young's possession are not the same dollars

14

used in the structuring scheme, that fact does not, as the Defendant suggests, militate dismissal of the forfeiture allegation.

Under § 853, the Government may, under certain circumstances, seek forfeiture of substitute assets. <u>Bornfield</u>, 145 F.3d at 1136. The Court may order the forfeiture of substitute property "as a result of any act or omission of the defendant" if the forfeitable property (1) "cannot be located upon the exercise of due diligence"; (2) "has been transferred or sold to, or deposited with, a third party"; (3) "has been placed beyond the jurisdiction of the court"; (4) "has been substantially diminished in value; or" (5) "has been commingled with other property which cannot be divided without difficulty." 21 U.S.C. § 853(p)(1); <u>see also</u> <u>United States v. Hill</u>, 167 F.3d 1055, 1073 (6th Cir.), <u>cert.</u> <u>denied</u>, 528 U.S. 872, 120 S.Ct. 175, 145 L.Ed.2d 148 (1999). "Once property subject to forfeiture . . . is no longer identifiable due to some act of the defendant, the government may seek any property, cash or merchandise, in satisfaction of the amount of criminal forfeiture to which it is entitled." <u>United States v. Voigt</u>, 89 F.3d 1050, 1088 (3d Cir.), <u>cert.</u> <u>denied</u>, 519 U.S. 1047, 117 S.Ct. 623, 136 L.Ed.2d 546 (1996). Substitute assets are by their very nature assets *not* involved in a criminal offense; but are nonetheless forfeitable under § 853. See <u>United States v. Pantelidis</u>, 335 F.3d 226, 233-34 (3d Cir. 2003); <u>see also</u> <u>Voigt</u>, 89 F.3d at 1084, 1088 (a defendant convicted of laundering $1.6 million was ordered to forfeit that amount in a money judgment; when government could not directly locate forfeitable funds in the defendant's current assets, the government was permitted to satisfy the judgment by seeking forfeiture of the defendant's assets as substitute assets). In order to obtain substitute assets, it is not necessary for the Government to establish a nexus between the offense and the substitute property. "[S]uch a nexus would render forfeiture of the property as a substitute asset unnecessary." <u>United States v. Candelaria-Silva</u>, 166 F.3d 19, 42 (1st

Cir. 1999), cert. denied sub nom. Ortiz-Miranda v. United States, 529 U.S. 1055, 120 S.Ct. 1559, 146 L.Ed.2d 463 (2000); see also Voigt, 89 F.3d at 1086 ("[t]he substitute asset provision comes into play only when forfeitable property cannot be identified as directly 'involved in' or 'traceable to'" the offense).

The forfeiture of substitute assets is left exclusively to the Court. Candelaria-Silva, 166 F.3d at 43. "[T]he defendant has a right to have the amount subject to forfeiture determined, in the first instance, by the jury. But the jury has no role in determining, subsequently, whether the property has been dissipated and whether the government is thereby entitled to seek the forfeiture of substitute assets." Id. (internal citations omitted).

Furthermore, as a member of a conspiracy with Lang, Young is jointly responsible for forfeiture based on the reasonably foreseeable conduct of his co-conspirator. See United States v. Bollin, 264 F.3d 391, 422 (4th Cir. 2001), cert. denied sub nom. Gormley v. United States, 535 U.S. 989, 122 S.Ct. 1544, 152 L.Ed.2d 469 (2002); United States v. Hurley, 63 F.3d 1, 22-23 (1st Cir. 1995), cert. denied sub nom. Saccoccia v. United States, 517 U.S. 1105, 116 S.Ct. 1322, 134 L.Ed.2d 474 (1996) (forfeiture award against defendants appropriate under this theory even though the funds had been forwarded to co-conspirators).

The cases cited by the Defendant in his reply brief in support of his position are unavailing. In United States v. Genova, 333 F.3d 750 (7th Cir. 2003), reh'g denied (Aug. 18, 2003), the mayor of Calumet City, Illinois appointed defendant Lawrence Gulotta as city prosecutor and arranged for Gulotta's law firm to receive the bulk of the city's legal business. Genova, 333 F.3d at 754. Gulotta then kicked back to the mayor a percentage of the payments his firm obtained from the city. Id. Gulotta was convicted of bribery and mail fraud and ordered to forfeit $270,944.00, the entire

16

amount paid by the city to his law firm, without deduction for the bribes paid to Genova. In addition, the court ordered co-defendant Genova to forfeit the bribes he received. Id. at 754, 761. The Seventh Circuit, noting that forfeiture is "gain based," concluded that

> [t]he amount that Gulotta received from the City and handed over to Genova is not a net profit from Gulotta's perspective; bribes paid to Genova were a cost of doing business that . . . must be deducted. [The law firm] does not have the money any longer, so Gulotta cannot turn it over to the United States. Nonetheless Genova and Gulotta, as partners in crime, are jointly and severally liable for the forfeitable proceeds of their activities. So the kickback, after being subtracted as a cost from Gulotta's perspective, is added back as proceeds from Genova's.

Id. at 761. Genova involved the forfeiture statute utilized in connection with the violation of the racketeering statute, which provides in pertinent part that any person violating the statute must forfeit to the United States "any property constituting, or derived from, any *proceeds* which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of" the statute. 18 U.S.C. § 1963(a)(3) (emphasis added). The court stated that, under the language of the applicable forfeiture provision, "there must *be* "proceeds" -- which means profits net of the costs of the criminal business." Id. (emphasis in original). The case did not, however, address the "involved in" or "traceable to" language before the Court in this case.[2]

In United States v. Swanson, 394 F.3d 520 (7th Cir. 2005), the Seventh Circuit applied Genova in analyzing forfeiture with respect to a money-laundering conviction governed by § 982(a)'s "involved in" language. The court found that funds listed in the government's forfeiture that arose from a particular legitimate transaction were not "involved in" the offense and, therefore, were not subject to forfeiture, based in part on the notion espoused in Genova that the defendant "gained

---

[2]A case from the Sixth Circuit cited by the Defendant, United States v. Corrado, 227 F.3d 543 (6th Cir. 2000), also based on the "proceeds" language of the racketeering forfeiture statute, is irrelevant to the Court's determination in the instant case for the same reason.

nothing" from the transaction. <u>Swanson</u>, 394 F.3d at 529. Specifically, the funds at issue consisted of payment by a corporation of which Swanson was chief executive officer and another entity for the acquisition of third business. <u>Id.</u> at 523, 529. The court articulated in dicta that "[i]t is true that <u>Genova</u> involved forfeiture under a RICO statute, but the philosophy is no different here. <u>Genova</u> makes clear that money that a defendant caused a victim to lose is properly accounted for by an order of restitution; only assets gained by the defendant can be collected via a forfeiture order." <u>Swanson</u>, 394 F.3d at 529. Significantly, the funds for the legitimate acquisition were not paid by Swanson and never passed through his hands. In addition, while the <u>Swanson</u> court briefly recognized the existence of the substitute assets provisions in a footnote, it made no application thereof to the issues raised.

The remaining cases from this circuit cited by the Defendant for the broad proposition that forfeiture can never be imposed absent a gain on the part of the defendant are equally unpersuasive, as they address statutes different from those before the Court here and do not involve the application of substitute assets provisions.[3]

---

[3]In <u>United States v. O'Dell,</u>247 F.3d 655, 661 (6th Cir. 2001), <u>reh'g en banc denied</u> (June 12, 2001), the government sought civil forfeiture of certain farm property following the defendant's conviction for growing marijuana thereon. The court noted that "the government takes the forfeited property that was in the hands of the defendant at the time of the offense, not at the time of conviction." <u>O'Dell</u>, 247 F.3d at 685. In that case, the deed to the farm was held in escrow until the defendant had paid the indebtedness in full to the seller, his father. <u>Id.</u> Shortly after the defendant's arrest, he stopped making payments and his father enforced a portion of the escrow agreement permitting him to recall the deed in the event of default by the defendant. He paid off the outstanding debt and, at that point, the defendant's interest in the farm was terminated pursuant to the terms of the escrow agreement. <u>Id.</u> The court therefore held that it could not order forfeiture of the defendant's interest in the farm that no longer existed. <u>Id.</u> The case did not involve the substitution of assets, however.

In <u>United States v. Any and All Radio Station Transmission Eq.</u>, 218 F.3d 543, 549 (6th Cir. 2000), the court observed generally that "property actually used to commit an offense may be

For the reasons articulated herein, the motion for arrest of judgment is DENIED.

IT IS SO ORDERED this ⁹ᵗʰ day of June, 2005.

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

subject to forfeiture," a broad statement with which this Court concurs. However, the case cited involved a civil in rem forfeiture action, rather than one for criminal forfeiture, against equipment used by the claimant to engage in unlicensed radio broadcasting in violation of the Communications Act of 1934, 47 U.S.C. §§ 301, 510, to which the question of substitute assets raised in this case has no application.

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 188 in case 2:03-CR-20400 was distributed by fax, mail, or direct printing on June 10, 2005 to the parties listed.

Keltie Hays
NEAL & HARWELL, PLC
150 Fourth Ave., N.
Ste. 2000
Nashville, TN 37219

Robert L. Hutton
GLANKLER BROWN, PLLC
One Commerce Square
Suite 1700
Memphis, TN 38103

Thomas M. Leveille
HAGOOD TARPY & COX, PLLC
2100 Riverview Tower
900 S. Gay St.
Knoxville, TN 37902

L. Jeffrey Hagood
HAGOOD TARPY & COX, PLLC
2100 Riverview Tower
900 S. Gay St.
Knoxville, TN 37902

Jerry R. Kitchen
U.S. ATTORNEY
109 S. Highland Ave.
Jackson, TN 38301

Frederick H. Godwin
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Allan J. Wade
BAKER DONELSON BEARMAN & CALDWELL
2000 First Tennessee Bldg.
Memphis, TN 38103

John W. Pierotti
GLANKLER BROWN
One Commerce Sq.
Ste. 1700
Memphis, TN 38103

Lori Hackleman Patterson
ALLAN J. WADE, PLLC.
119 S. Main St.
Ste. 700
Memphis, TN 38103

James F. Neal
NEAL & HARWELL, PLC
150 Fourth Ave., N.
Ste. 2000
Nashville, TN 37219

Charles A. Wagner
WAGNER MYERS & SANGER
800 S. Gay St.
Ste. 1801
Knoxville, TN 37929

Honorable J. Breen
US DISTRICT COURT